# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| DEVELOPMENT SPECIALISTS, INC., | ) |  |
|---|---|---|
| | ) | |
| APPELLANT | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:16-CV-421-DBH |
| | ) | |
| MICHAEL W. KAPLAN, ET AL., | ) | |
| | ) | |
| APPELLEES | ) | |

## DECISION AND ORDER ON BANKRUPTCY APPEAL

This is an appeal under 28 U.S.C. § 158(a)(1) from the bankruptcy court's final judgment in an adversary proceeding. That court found no fraudulent debtor transfers and no breach of corporate directors' duties. After oral argument on April 12, 2017, I now **AFFIRM** the bankruptcy court, although my reasoning differs somewhat.

### STANDARD OF REVIEW

The parties agree on the standard of review. Appellant's Br. 6 (ECF No. 11); Appellees' Br. 2 (ECF No. 15). I accept the bankruptcy court's factual findings unless they are clearly erroneous. I review the bankruptcy court's conclusions of law de novo. Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52; In re Furlong, 660 F.3d 81, 86 (1st Cir. 2011).

# FACTUAL AND PROCEDURAL BACKGROUND[1]

The plaintiff/appellant Development Specialists, Inc. is the liquidating trustee for six related debtors in the leather business that entered chapter 11.[2] The trustee seeks to avoid certain transfers by some of the debtors and to recover damages from the former shareholders[3] and directors[4] of one of those debtors, Prime Maine.[5] The trustee's focus is a complex transaction that closed on November 20, 2007 and a later 2010 release related to that transaction.

In 2007, like other U.S. companies in the leather tanning and finishing industry, Prime Maine experienced profitability challenges. Memorandum of Decision (Mem. of Dec.) 4 [App. 1329]. Meriturn Partners, LLC (Meriturn), a private equity firm that specializes in restructurings and that had recently acquired Irving Tanning, expressed an interested in Prime Maine, seeing an opportunity to merge Prime Maine with Irving Tanning and gain access to additional customers and markets. Id. at 6 [App. 1331]. Meriturn and Prime

---

[1] I do not recount the record evidence in detail. The First Circuit's analysis of any appeal will focus directly on the bankruptcy court, not this court's ruling. 28 U.S.C. § 158(d); In re Simmons, 810 F.3d 852, 856–57 (1st Cir. 2016) ("We accord no special deference to determinations made by the first-tier appellate tribunal but, rather, train the lens of our inquiry directly on the bankruptcy court's decision." (quoting Wheeling & Lake Erie Ry. Co. v. Keach (In re Montreal, Me. & Atl. Ry., Ltd.), 799 F.3d 1, 5 (1st Cir.2015)).

[2] The trustee was appointed in accordance with the Debtors' First Amended Plan of Reorganization Dated September 25, 2012, in the jointly administered chapter 11 case of six related debtors: Irving Tanning Company (Irving Tanning), Prime Tanning Co., Inc. (Prime Maine), Prime Tanning Corp. (Prime Missouri), Cudahy Tanning Company, Inc. (Cudahy), Wismo Chemical Corp. (Wismo), and Prime Tanning Company, Inc. (Prime Delaware). The Plan was confirmed on October 18, 2012. [App. 0102–113].

[3] Michael W. Kaplan, M. Stephen Kaplan, Marjory A. Kaplan, the Glenyce S. Kaplan Lifetime Trust-1994, the Prime Tanning Co., Inc. Voting Trust-1994, and the Estate of Leonard D. Kaplan.

[4] Steven A. Goldberg, Glenyce S. Kaplan, Eliseo Pombo, Robert B. Moore, Michael Kaplan, and Stephen Kaplan.

[5] Prime Maine operated a leather finishing operation in Berwick, Maine, and, through its wholly owned subsidiary Prime Missouri, a leather tanning operation in St. Joseph, Missouri. Memorandum of Decision (Mem. of Dec.) 3 [App. 1328].

Maine began negotiations and exchanged multiple letters of interest, culminating in a May 31, 2007 letter that outlined a series of steps whereby Irving Tanning and Prime Maine would come under the common ownership of a new holding company, Prime Delaware.[6] Am. Joint Stipulation of Undisputed Facts ¶¶ 27–29 [App. 1143]. Prime Maine, Irving Tanning, and Prime Delaware then entered into an August 15, 2007 Contribution Agreement, which was subsequently amended on the closing date, November 20, 2007. Id. ¶¶ 30–34 [App. 1143–44]. In the end Meriturn contributed about $3 million while Irving Tanning, Prime Delaware, Prime Maine, Prime Missouri, and Cudahy entered into substantial lien-secured loan agreements with Wells Fargo, N.A. (Wells Fargo) to complete the financing.[7] At the closing, Irving Tanning, Prime Maine, and Cudahy all came under the common ownership of Prime Delaware, and Prime Missouri remained a wholly owned subsidiary of Prime Maine.[8]

At the closing, (1) Irving Tanning, Prime Delaware, Cudahy, Prime Maine, and Prime Missouri executed a $1,860,000 term note, a $40,000,000 revolving note, and a $25,000,000 revolving note, all payable to Wells Fargo,[9] Mem. of Dec. 10 [App. 1335]; (2) the debtors actually borrowed from Wells Fargo $1,656,785 under the term note and $28,165,000 under the revolving notes, Am. Joint

---

[6] Meriturn later chose to include the acquisition of Cudahy, a Wisconsin corporation, in the transaction, so that Irving Tanning, Prime Maine, and Cudahy would all come under the common ownership of Prime Delaware. Mem. of Dec. 9 [App. 1334].

[7] Although the bankruptcy court did not make any findings as to Meriturn's ultimate contributions, its principal Mark Kehaya testified that Meriturn ended up investing $3 million in the November 2007 transaction. Trial Tr. 862:1–7 [App. 2247].

[8] Wismo seems to have remained a partly-owned subsidiary of Prime Missouri. See Mem. of Dec. 1–2 [App. 1326–27]; Am. Joint Stipulation of Undisputed Facts ¶ 7 [App. 1139].

[9] The same companies also entered into an amended and restated credit and security agreement with Wells Fargo, creating liens on their assets. Mem. of Dec. 10 [App. 1335].

3

Stipulation of Undisputed Facts ¶¶ 35–36 [App. 1141]; (3) Irving Tanning, Prime Delaware, Prime Maine, Cudahy, and Prime Missouri directed Wells Fargo to pay $10,629,459 in cash proceeds to Prime Maine's shareholders (the shareholder defendants) and $4 million in non-competition payments to Michael and Stephen Kaplan[10] (previously co-chairs of the Prime Maine and Prime Missouri boards); (4) Prime Delaware delivered a $3,817,000 promissory note to the Prime Maine shareholders; (5) Prime Delaware issued 40% of its shares to the Prime Maine shareholders; (6) Prime Maine delivered the $9 million cash value of life insurance policies to certain Prime Maine shareholders; and (7) Prime Delaware entered into employment and non-competition agreements with Michael and Stephen Kaplan. Mem. of Dec. 10–11 [App. 1335–36]; see supra note 10. Prime Maine's shareholders transferred all their shares, *i.e.*, complete ownership of Prime Maine and its subsidiary Prime Missouri, to Prime Delaware. Mem. of Dec. 8–9 [App. 1333–34]; Am. Joint Stipulation of Undisputed Facts ¶ 51 [App. 1147].

As a result, the Prime Maine shareholders collectively received in excess of $23.6 million in exchange for their stock and agreements. Mem. of Dec. 14 [App. 1339]. The trustee claims that the November 20 transaction amounted to a leveraged buyout (LBO), that the Prime Maine shareholders are responsible for fraudulent transfers by Prime Delaware, Prime Maine, and Prime Missouri, and that the directors of Prime Maine[11] breached duties of loyalty and care to that

---

[10] The $4 million in non-competition payments were owed to Michael and Stephen Kaplan as part of the non-competition agreements, dated November 20, 2007. Am. Joint Stipulation of Undisputed Facts ¶¶ 38, 51 [App. 1145, 1147].
[11] The amended joint stipulation of undisputed facts notes that Michael Kaplan, Stephen Kaplan, Steven Goldberg, and Robert Moore were directors of Prime Missouri as well as Prime Maine, but the stipulation does not say that the trustee sued them in their capacity as directors of Prime

4

corporation.[12] The shareholders and directors dispute the LBO characterization, preferring to call the transaction a merger or roll-up,[13] and assert that there were no fraudulent transfers and no breaches of directors' duties. After a 5-day bench trial, the bankruptcy court filed a written opinion in favor of the shareholders and directors, finding that the trustee had not met its burden on any of the claims,[14] and entered final judgment accordingly. The trustee has appealed.[15]

## ANALYSIS

### *Fraudulent Transfers*

Maine has adopted the Uniform Fraudulent Transfer Act (UFTA), 14 M.R.S.A. § 3571.[16] It permits a creditor to challenge transfers where there was either actual or constructive intent to defraud. 14 M.R.S.A. § 3575.

---

Missouri. See Am. Joint Stipulation of Undisputed Facts ¶¶ 17, 18, 23, 26 [App. 1141–43]. The adversary complaint names as the director defendants Steven Goldberg, Glenyce Kaplan, Eliseo Pombo, Robert Moore, Michael Kaplan, and Stephen Kaplan, "in their capacity as the former directors of Prime Maine." Compl. 3 [App. 0116]. The bankruptcy court's decision also refers to the "director defendants" as "the former directors of Prime Maine: Michael Kaplan, Stephen Kaplan, Glenyce Kaplan, Steven Goldberg, Eliseo Pombo, and Robert Moore." Mem. of Dec. 2 [App. 1327].

[12] The trustee also brings claims for actual and constructive fraudulent transfer regarding the 2010 Release, where the shareholder defendants were discharged from the types of claims brought by the trustee in this adversary proceeding. Compl., Counts VII, VIII, IX, X, XI, XII [App. 0146–56]. For that release, the shareholder defendants relinquished all their shares of Prime Delaware, cancelled Prime Delaware's $3,817,000 promissory note, and released Prime Delaware from its obligations under the non-competition and employment agreements with Michael and Stephen Kaplan. Mem. of Dec. 11–12 [App. 1336–37].

[13] Appellees' Br. 22 n.12 (ECF No. 15).

[14] In re Irving Tanning Co., 555 B.R. 70 (Bankr. D. Me. 2016); Mem. of Dec. [App. 1326–49].

[15] The shareholders and directors cross-appealed the bankruptcy court's post-trial ruling that allowed the trustee to amend the complaint to conform to the evidence, thereby including the cash value of certain life insurance policies in what Prime Maine transferred. Mem. of Dec. 13 n.5 [App. 1338]. Because I affirm the bankruptcy court's decision on liability, I do not find it necessary to address the cross-appeal. The bankruptcy court's ruling would be reviewed for abuse of discretion, Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(b); Antilles Cement Corp. v. Fortuno, 670 F.3d 310, 319 (1st Cir. 2012), a deferential standard of review.

[16] The adversary complaint also seeks relief under 11 U.S.C. § 544(b), Compl. ¶ 5 [App. 0117], but the parties have confined their arguments in the bankruptcy court and this court to Maine law.

***Actual Fraud in November 2007 Transaction*** [17]

The trustee asserts actual fraud in the transfers made by Prime Maine and Prime Missouri on November 20, 2007.[18] According to Maine's UFTA, a transfer is fraudulent if the debtor "made the transfer or incurred the obligation . . . [w]ith actual intent to . . . defraud any creditor of the debtor." 14 M.R.S.A. § 3575(1)(A). The statute also lists eleven factors that "may be given" consideration (along with other unidentified factors) in determining actual intent. Id. § 3575(2).[19] Maine's Law Court has stated: "The court may consider factors other than the [listed factors], and any combination of factors may support a determination of actual intent." FDIC v. Proia, 663 A.2d 1252, 1254 (Me. 1995).

The bankruptcy court in this case found that the shareholder defendants did not engage in actual fraud. Mem. of Dec. 13–18 [App. 1338–43]. The trustee correctly observes that the UFTA focuses not on the shareholders but on the debtors, the corporations that made the transfers. But it was the trustee that, in the relevant counts of the adversary complaint, focused on the noncorporate defendants to make the case for actual fraud.[20] That is understandable, because the individuals' intent could be attributed to the corporations. It would be a

---

[17] Compl., Counts I, IV [App. 0138, 0142].
[18] In its brief in this court, the trustee referred to Prime Delaware in place of Prime Missouri in one of this argument's subheadings, Appellant's Br. 47 (ECF No. 11), but I confirmed at oral argument that its argument of actual fraud applies to Prime Maine and Prime Missouri, and that was the sole focus of the text of its brief, see id. at 43–50.
[19] The bankruptcy court found that the trustee proved only two of these factors: that transfers were made to insiders (the cash transfers and the life insurance proceeds were transferred to the shareholder defendants), and the 2007 transaction involved the transfer of substantially all of Prime Maine's assets. Mem. of Dec. 16 [App. 1341].
[20] See Compl. ¶ 126 (what shareholder defendants allegedly foresaw), ¶ 153 (same, but speaking of the individual defendants generally), ¶ 122 (defendants were "insiders of Prime Maine"), ¶ 149 (same) [App. 0139, 0142–43].

6

pointless exercise to send the case back to the bankruptcy court now to ask for findings about these two debtors (Prime Maine and Prime Missouri) as distinct from the shareholders on this issue.[21] And certainly on this record, an appellate court is not in a position to find the contrary, *i.e.*, actual intent on the part of the debtors: that is for the factfinder.

According to Maine law, actual fraud under the UFTA must be proven by clear and convincing evidence. Proia, 663 A.2d at 1254 n.2. I have read the trial transcript and the relevant exhibits. Although there is room for a difference of opinion over whose version of value in the transaction to believe, the bankruptcy court's factual findings that there was no actual fraud are not clearly erroneous. Therefore its conclusions on those counts must stand.

***Constructive Fraud in November 2007 Transaction*[22]**

The trustee asserts constructive fraud in the November 20 transfers made by Prime Delaware, Prime Maine, and Prime Missouri. According to the statute, a transfer is fraudulent under this prong of the UFTA if the debtor:

---

[21] Neither side moved for additional findings under Federal Rule of Bankruptcy Procedure 7052 (applying Fed. R. Civ. P. 52 to adversary proceedings). "[W]hen a party fails to make a Rule 52(b) motion [for additional findings], that party should not be precluded altogether from appeal, but that party cannot challenge the specificity of the findings." 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2582 (4th ed. 2013). "Rule 52(b) represents the principal, and preferred, mechanism for challenging the district court's failure to find facts, as it allows a court that has recently tried the case, rather than an appellate tribunal perusing a cold record, to determine the propriety of considering those additional facts. . . . When a party complains of incomplete findings of fact after neglecting to file a Rule 52(b) motion, remand is appropriate only in cases where (1) the district court failed to make findings as to a certain fact and (2) that fact is essential to the resolution of a material issue." Ne. Drillling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 35 (1st Cir. 2001). In this case, the bankruptcy court is the trial court, and I am serving as an intermediate appellate court.

[22] Compl., Counts II, III, V, VI [App. 0140–41, 0143–45]. The trustee's brief and its counsel's statement at oral argument confirm that the constructive fraud assertion lies against Prime Delaware, Prime Maine, and Prime Missouri. See Appellant's Br. 32–43 (ECF No. 11).

7

>made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:
>   (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>   (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

Id. § 3575(1)(B). The cases and the commentators call this constructive fraud.

Applying a preponderance of the evidence standard,[23] the bankruptcy court found that the trustee did not satisfy the first, underlying, element ("without receiving a reasonably equivalent value in exchange for the transfer") because Prime Delaware did receive reasonably equivalent value in exchange for the transaction with Prime Maine's shareholders.[24] This finding lies at the heart of the LBO labelling controversy. The trustee demands and the shareholders/directors resist the LBO label because it generally intensifies the scrutiny of a transaction.[25] The trustee argues that once the LBO label is applied, the "reasonably equivalent value in exchange" element of the fraudulent transfer statute can almost never be satisfied.[26] In its decision, the bankruptcy

---

[23] The burden of proof for constructive fraudulent transfer under Maine's UFTA is in doubt. In a case raising issues of both actual and constructive fraudulent transfers, the Maine Law Court declared that "[o]ne who challenges the validity of a transfer must prove that the conveyance was fraudulent by clear and convincing evidence." Morin v. Dubois, 1998 ME 160, ¶ 3, 713 A.2d 956 (citing FDIC v. Proia, 663 A.2d 1252, 1254 n.2 (Me.1995)). The Law Court did not suggest that constructive fraud involves a different burden of proof. Morin, 1998 ME 160, ¶ 8, 713 A.2d 956. The First Circuit has used the preponderance of the evidence standard for constructive fraud under New Hampshire's UFTA, but there were no New Hampshire cases interpreting the statute. In re Jackson, 459 F.3d 117, 122–23 (1st Cir. 2006). (The stricter standard of clear and convincing evidence would be even less favorable to the trustee.).
[24] Mem. of Dec. 19–23 [App. 1344–48].
[25] "[F]ailed leveraged buyouts merit close scrutiny under the fraudulent conveyance laws." Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992).
[26] Appellant's Br. 33–34 (ECF No. 11); accord 4 William L. Norton, Norton Bankruptcy Law and Practice § 68:8 (3d ed. 2008) (because "courts have almost uniformly held that it is generally appropriate to collapse the separate, preplanned steps (loan—use of proceeds to pay

court did not refer to the 2007 transaction as an LBO, calling it a "merger" and calling Prime Delaware "the resulting business" in light of testimony from Stephen Kaplan, Michael Kaplan, Moore, Goldberg, and Pombo. Mem. of Dec. 17 [App. 1342]. I respect the bankruptcy court's decision not to accept or reject the LBO label. Labelling too often is a substitute for analysis.[27] In the end, the bankruptcy court gave the transaction the scrutiny it deserved. Once again, there is room for a difference of opinion on whether fair value was exchanged between the shareholders and Prime Delaware, but the bankruptcy court's factual finding[28] that the exchange was fair is not clearly erroneous.[29]

---

shareholders—commitment of target's credit and/or pledge of its assets) . . . . almost invariably . . . an LBO does not result in fair consideration to the target (from the standpoint of the target's creditors) with respect to the loan proceeds paid to its shareholders in an LBO"); Angelo Guisado, Revisiting the Leveraged Buyout: Is Constructive Fraud Going Too Far?, 46 J. Marshall L. Rev. 429, 441 (2013) ("It is doubtful, however, that any LBO can meet the fair consideration standard."); Laura Femino, Note, Ex Ante Review of Leveraged Buyouts, 123 Yale L.J. 1830, 1837–38 (2014) ("While some courts have recognized that an LBO may give the target reasonably equivalent value in the form of indirect benefits, such as 'the ability to obtain substantial credit' or 'the synergy expected to result from the combination,' such a finding is the exception and not the rule; courts generally agree that the transfer of a lien in an LBO gives the target no reasonably equivalent value. For this reason, an LBO will nearly always satisfy this first prong of the constructive fraudulent transfer definition.").

[27] So far as labels go, the transaction here seems to have been both an LBO and a roll-up. All the companies ended up owned by the new holding company Prime Delaware, evidence of a roll-up. As for the LBO characterization, "[t]he effect of an LBO is that a corporation's shareholders are replaced by secured creditors. Put simply, stockholders' equity is supplanted by corporate debt." Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 645 (3d Cir. 1991). That is what happened here as a result of the shareholder payout with proceeds from the Wells Fargo loans.

[28] "Whether fair consideration has been provided is a question of fact." 4 William L. Norton, Norton Bankruptcy Law and Practice § 68:4 (3d ed. 2008); see also 5-548 Collier on Bankruptcy ¶ 548.05 (16th ed. 2010) ("Once a court determines value given and received, what remains is a comparison of the two. 'The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received.' The exchange need not be strictly equivalent." (quoting Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997))).

[29] The trustee does not dispute the bankruptcy court's calculation of the cash transfers, i.e., (i) $10,629,459 cash consideration to the Shareholder Defendants, (ii) $4 million in non-competition payments to Michael and Stephen Kaplan, and (iii) $9 million in life insurance value to Michael, Stephen, and Marjory Kaplan and the Estate of Leonard Kaplan. The trustee does, however, claim that the bankruptcy court failed to include: (a) the $3,817,000 shareholder note issued by Prime Delaware, and (b) the 40,000 shares of Prime Delaware stock, which Carl Jenkins, the appellees' expert witness, valued at $251.49 per share, for a total of $10,059,600.

The trustee correctly points out that the bankruptcy court's opinion focuses on the value of what the *shareholders* received, and what they transferred in exchange for it, Mem. of Dec. 19–23 [App. 1344–48], not on the value of what any or all of the *debtors* transferred, the focus of the statutory language. If Prime Delaware is the debtor in question, however, the bankruptcy court's findings certainly suffice to show a fair value exchange.[30]

But the bankruptcy court did not separately address what Prime Maine and Prime Missouri each transferred or gave up and what, if anything, each of them received in exchange.[31] Instead, the bankruptcy court addressed the transfers in their entirety:

---

But even with these additions, the value of Prime Maine stock as found by the bankruptcy court exceeded the total transferred to the shareholders. See Mem. of Dec. 20–22 [App. 1345–47]. Based upon his review of Prime Maine's closing balance sheet, which showed a total equity of $44.2 million (total assets of $67.4 million minus total liabilities of $23.2 million), Jenkins concluded that the shareholder defendants were not overpaid for their shares of Prime Maine. Expert Report of Carl F. Jenkins ¶¶ 43–45 [App. 3716–17]. Thus, the trustee has not demonstrated that the bankruptcy court clearly erred in finding that the shareholder defendants exchanged reasonably equivalent value with Prime Delaware.

[30] The trustee also argues that the bankruptcy court clearly erred in finding reasonably equivalent value by relying on the post-closing consolidated tax returns for Prime Delaware and its subsidiaries. Appellant's Reply Br. 14–15 (ECF No. 18). The bankruptcy court determined that Grover Elliott, the debtors' Responsible Officer and former Vice President of Finance and CFO, "conceded" that the $46 million on Prime Delaware's tax return "was accurate and represented the retained earnings figure for Prime Maine and Prime Missouri and did not include any values for the retained earnings for Irving Tanning or Cudahy." Mem. of Dec. 21–22 [App. 1346–47]. Elliott's testimony, however, was that the $46 million included Prime Maine, Prime Missouri, *Irving Tanning, and Cudahy.* Trial Tr. 1040:2–17 [App. 2427]. But even if the bankruptcy court erred in its interpretation of Elliott's testimony regarding the $46 million figure on the tax return, the court still properly credited the consolidated balance sheets for Prime Maine and Prime Missouri, see Defs.' Trial Ex. 40, 41 [Supp. App. 5927–29], that reported total equity greater than $44 million as of the closing date, see Mem. of Dec. 22 [App. 1347]; see also Expert Report of Carl F. Jenkins ¶¶ 43–45 [App. 3716–17]. These figures support the bankruptcy court's finding that the value of Prime Maine was reasonably equivalent to the consideration the shareholder defendants received. Mem. of Dec. 22–23 [App. 1347–48].

[31] The trustee's post-trial brief in the bankruptcy court demanded such a focus. Pl.'s Post-Trial Br. 3, 4, 11–13 [App. 1152, 1153, 1160–62]. The trustee also argued that in this case there were no indirect benefits or synergies for the debtors. Pl.'s Post-Trial Br. 11-13 [App. 1160–62]. The shareholder defendants, on the other hand, argued that the bankruptcy court should consider indirect benefits, namely the "benefit of synergistic efforts" and Stephen Kaplan's testimony

10

> There is no dispute that in consideration of the transfer of 100% of the shares of Prime Maine, the Shareholder Defendants received approximately $23.6 million at the closing in the form of the Cash Proceeds ($14.6 million) and the Insurance Proceeds [actually cash value] (approximately $9 million), and 40% of Prime Delaware.

Mem. of Dec. 20 [App. 1345].

The shareholders argue that it was sufficient for the bankruptcy court to focus on Prime Delaware because these transfers collectively amounted to a "roll-up."[32] But the trustee argues that the bankruptcy court had to assess the transfers from each debtor separately.[33] As part of the November 20, 2007 closing, Prime Delaware, Prime Maine, and Prime Missouri all signed notes to Wells Fargo, and each gave the bank a security interest in its respective assets.[34] Then all three directed Wells Fargo to pay the shareholder defendants $10,629,459 and Michael and Stephen Kaplan $4 million in non-competition payments under the line of credit. Mem. of Dec. 10–11 [App. 1335–36]. But the "exchange" from the shareholders—all their stock in Prime Maine—went only to Prime Delaware.[35]

---

discussing "the intangible assets and goodwill" of Prime Maine. Defs.' Post-Trial Br. 7–8 [App. 1082–83].

[32] They contend that the 2007 transaction "was not a leveraged buyout but instead a merger or roll-up of companies." Appellees' Br. 22 n.12 (ECF No. 15). The bankruptcy court treated the 2007 transaction as a "merger." Mem. of Dec. 17 [App. 1342].

[33] See supra note 31.

[34] The Maine UFTA defines "transfer" as including "creation of a lien or other encumbrance." 14 M.R.S.A. § 3572(12). The UFTA defines "lien" as "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common law lien or a statutory lien." Id. § 3572(8).

[35] Previous Maine bankruptcy court cases have discussed how the analysis applies when there are parents and subsidiaries and issues of indirect benefit and/or synergies. E.g., In re Marquis Prods, Inc., 150 B.R. 487, 491 (D. Me. 1993); see also 4 William L. Norton, Norton Bankruptcy Law and Practice § 68:4 (3d ed. 2008) ("Indirect economic benefits or intangibles may be considered in determining value. For instance, LBO targets may be able to argue that as a result of an LBO with another strategic corporate entity, the target's new consolidated corporate group creates synergies that arguably provide reasonably equivalent value if the LBO is challenged as

Appellate review might have been more straightforward if the bankruptcy court, in the precise context of assessing reasonably equivalent value for constructive fraud purposes, had focused on the individual debtors, their transfers, and the resulting benefits (direct, indirect, and/or synergy) expressly; or, alternatively, had explained why it concluded that such individual attention to each debtor was not required. Since I am not the factfinder, I cannot decide the factual issue of whether these two companies, Prime Maine and Prime Missouri, each received a fair return in exchange[36] as, for example, by access to a new and different line of credit[37] or other indirect benefits, or whether that individual attention was unnecessary. What I do observe is that the bankruptcy

---

a fraudulent conveyance."); Irina Fox, "Reasonably Equivalent Value" in § 548 Avoidance Actions: An Analytical Framework Post-In re Tousa, Inc., 20 J. Bankr. L. & Prac. 4 art. 2, at 20–21 (2011) ("Even indirect benefits to the debtor-transferor may constitute reasonably equivalent value if direct benefits accrue to 'the transferor's solvent subsidiary, the transferor's alter ego, an entity with which the transferor shares "community of interests," an entity upon which the transferor's business relies, and in a situation where the indirect effect of the transfer enables the transferor to accomplish a specific objective.'" (quoting 4 William L. Norton, Norton Bankruptcy Law and Practice § 67:4 (3d ed. 2008))).

[36] The treatises acknowledge that the precise value of debtor obligations is difficult to measure in determining "reasonably equivalent value," and, particularly in the LBO context, refer to the inclusion of indirect benefits. Norton states:
> Value for fraudulent conveyance purposes is not the proverbial "peppercorn" that may suffice under contract law. Rather, value for purposes of determining fair consideration under fraudulent conveyance laws is measured in terms of economic value from the perspective of third-party creditors. Since the proceeds of an LBO debt are used to pay off the selling owners and do not flow into the target or pay off legitimate debts of the target, other creditors of the target may contend that the target has not received fair consideration for the LBO debt incurred to finance the transaction. Indirect economic benefits or intangibles may be considered in determining value.

4 William L. Norton, Norton Bankruptcy Law and Practice § 68:4 (3d ed. 2008). Collier states that "transfers, either in the nature of liens or of funds, among subsidiaries of a common parent may be lacking reasonably equivalent value if there is no pre-existing debt owed by the transferor to the transferee." 5-548 Collier on Bankruptcy ¶ 548.05 (16th ed. 2010). Collier adds that in LBOs, the "value typically isn't direct," and the inquiry focuses "on the indirect benefits of the transaction." Id.

[37] Earlier in its opinion, the bankruptcy court referred to a pre-closing finding by Prime Maine's management advisory and financial services firm that Prime Maine "should be cautious regarding the fragility of its banking relationship with" its then lender. Mem. of Dec. 5 [App. 1330].

court did find synergy and indirect benefits in the transaction, albeit in a different portion of its decision, when it assessed reasonably equivalent value while dealing with *actual* fraud.[38] There, it rejected the trustee's argument that the trustee had established that "the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred," 14 M.R.S.A. § 3575(2)(H) (a statutorily listed indicium of fraud). The bankruptcy court pointed first to the analysis of exchange value that came in its later Section IV.B of the decision involving constructive fraud, Mem. of Dec. 19–23 [App. 1344–48], but then proceeded to recount the evidence showing that the participants all expected success from the

---

[38] As I have said before, see supra note 21, no party asked for additional findings under Rule 7052. Assessing indirect benefits can be a complex determination. 5-548 Collier on Bankruptcy ¶ 548.05 n.50 (16th ed. 2010) ("The benefits of such transactions are notoriously difficult to quantify."). Here, for example, looking at each debtor separately for what each transferred, how was the bankruptcy court to allocate the obligation and the security interest that all three Debtors joined in favor of Wells Fargo, or the joint drawdown on the line of credit at the closing? The bankruptcy court noted the loan agreements between the debtors and Wells Fargo and found that at the time of the 2007 transaction, the debtors actually borrowed $1,656,785 under the term note and $28,165,000 under the revolving notes. Mem. of Dec. 10 [App. 1335]. But the bankruptcy court did not specifically consider the value of the liens themselves in determining reasonably equivalent value. And in looking at the other side of the equation, the value each received, the bankruptcy court of this District recognized in 1993 that

> value may arrive in the transferor's hand indirectly, via the original recipient. Alternatively, circumstances may exist that require the court to ignore formal distinctions between the transferor and the third party, so that, despite the labels employed, the consideration for the transfer has been bestowed "directly" on the transferor. . . . Particularly in transactions that involve affiliated corporations, it may be the case that consideration given to one of the affiliates in return for the transfer of an interest of another, redounds sufficiently to the benefit of the transferor as to constitute reasonably equivalent value. . . . Or, in the classic case, a subsidiary receives an indirect benefit where its upstream guarantee enables its parent to procure a loan and, thus, to provide funds to the subsidiary.

In re Marquis Products, Inc., 150 B.R. 487, 491 (D. Me. 1993) (citing among other sources, Telefest, Inc. v. VU-TV, Inc., 591 F. Supp. 1368, 1379 (D.N.J. 1984) ("Where there are indicia of a bona fide financing arrangement, not designed as a shield against other creditors, the lack of perceptible 'direct' benefit to a subsidiary guaranteeing the loan of its parent should not be viewed as tantamount to a lack of 'fair consideration' under the UFCA. Indirect benefit provides the necessary 'fair consideration'.")). Thus, it may have been defensible here to treat the three debtors together, not separately, in evaluating the transfers.

13

November 2007 transaction. The bankruptcy court found that "[directors] Stephen Kaplan, Michael Kaplan, Mr. Moore, Mr. Goldberg, and Mr. Pombo all testified that the merger had the potential to create efficiencies, expand markets, lessen costs and allow the Kaplan family to continue its connection with the Prime brand into another generation." Mem. of Dec. 17 [App. 1342]. It is apparent that the bankruptcy court believed that this "synergy" was important[39] because, in a footnote to its statement in text that the parties expected success in the resulting business, it quoted a Third Circuit case for the proposition that:

> [T]he mere expectation that the fusion of two companies would produce a strong synergy (an expectation that turned out to be inaccurate in hindsight) would suffice to confer "value" so long as the expectation was "legitimate and reasonable." . . . Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.

Mem. of Dec. 17 n.6 (quoting Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 152 (3d Cir. 1996)) [App. 1342].[40] Thus, I conclude that the bankruptcy court, although it did not look at each debtor individually, did consider synergy and indirect benefits in its assessment of value exchanged.

In any event, the bankruptcy court made other findings that lead me to affirm its decision that constructive fraud did not occur even if the focus is on transfers from Prime Maine and Prime Missouri. The bankruptcy court found

---

[39] The trustee contended at oral argument before this Court that under the Maine statute, projected synergy is not a factor, but there are no Law Court cases that so hold.
[40] The bankruptcy court also quoted in text a portion of a Massachusetts bankruptcy case that considered "both direct and indirect benefits." Mem. of Dec. 20 (quoting In re Tri-Star Techs. Co., Inc., 260 B.R. 319, 325–26 (Bankr. D. Mass. 2001)) [App. 1345].

14

that the trustee did not establish either of the other two elements of constructive fraud, *i.e.*, either unreasonably small resulting capitalization or inability to pay debts as they came due.[41] See 14 M.R.S.A. § 3575(1)(B)(1) & (2). In this instance too, the bankruptcy court focused on Prime Delaware. But as to these two findings, the bankruptcy court's ruling ineluctably flows over to Prime Maine and Prime Missouri because, whatever label applies to the transaction, after the closing Prime Delaware was the sole shareholder of Prime Maine, which was in turn the sole shareholder of Prime Missouri; Prime Delaware was not an operating company.[42] There is no evidence in the record that would support a finding of unreasonably small capitalization or inability to pay debts as to either Prime Maine or Prime Missouri if in fact their corporate parent/grandparent

---

[41] The bankruptcy court stated that the evidence:
> support[ed] a finding that the Trustee was not able to satisfy the other elements of constructive fraud claims because at the time of the closing, Prime Delaware had sufficient assets in relation to the business [in which] it was engaged and the Defendants were reasonable in their belief that following the closing Prime Delaware would be able to pay its bills as they came due. Although at closing there were deferred payments of $1 million and $4 million of outstanding checks, the former occurred as Prime Delaware switched banks to Wells Fargo and the latter was, as Mr. Arden testified, not unusual for a company of Prime Delaware's size. Further, Prime Delaware was able to pay its creditors as the bills came due up through early to mid-2008 and for some courts, this alone would be sufficient to conclude that the Trustee's constructive fraud claims must fail. Although by 2009, Prime Delaware was unable to pay its vendors on a current basis and was forced to convert $8.7 million in accounts payable to vendor notes payable, the Trustee was not able to convincingly link those facts with the 2007 payments to the Shareholder Defendants. A more likely culprit was the unforeseen, intervening, and devastating impact of the recession of late 2007 through 2009, about which several Defendants testified and of which I can take judicial notice.

In re Irving Tanning Co., 555 B.R. 70, 85 n.11 (Bankr. D. Me. 2016) (citations omitted); Mem. of Dec. 23 n.11 [App. 1348]. At oral argument, the trustee treated this footnote as not "actual findings of fact," but as I pointed out earlier, see supra note 21, the trustee did not request additional findings, and I am satisfied that despite its location in a footnote and the language "supports a finding," it is in the end a finding of fact.

[42] The parties stipulated that Prime Delaware was a holding company. Am. Joint Stipulation of Undisputed Facts ¶ 5 [App. 1139]. The trustee also refers to it that way in its brief. Appellant's Br. 3 n.2 (ECF No. 11).

Prime Delaware was not subject to either of those taints as the bankruptcy court found.[43]

*2010 Release*[44]

Given my affirmance of the bankruptcy court's rulings that the trustee has no viable fraudulent transfer claims against the shareholders because it failed to prove either actual or constructive fraud in the November 20, 2007 transaction, I find it unnecessary to assess the validity of the February 4, 2010 release of such claims against the shareholders.

*Directors' Liability*[45]

The bankruptcy court ruled that because there were no fraudulent transfers, the directors of Prime Maine breached no duty of loyalty or care in the 2007 transaction. Mem. of Dec. 24 [App. 1349]. I disagree with that reasoning. The measure of a director's duties of loyalty and care under the Maine Business Corporation Act is not co-extensive with the measure of whether a transaction the director approved amounts to a fraudulent transfer under Maine's UFTA.[46] The trustee points to evidence that the directors did not understand their duties

---

[43] Again, I observe that the trustee did not request additional findings under Bankruptcy Rule 7052. See supra note 21. Moreover, the trustee's lawyer at oral argument contended that "the driver post-LBO transaction was Prime Maine and Prime Delaware," that while the court must look at each debtor individually, "the fortunes of one were the fortunes of all," and that Prime Delaware was "a holding company which essentially had no assets other than the stock of the companies whose stock it owned."

[44] Compl., Counts VII, VIII, IX, X, XI, XII [App. 0146–56].

[45] Compl., Counts XIII (duty of care) & XIV (duty of loyalty) [App. 0156–59].

[46] The Maine Business Corporation Act (MBCA) imposes a fiduciary duty of care, providing that a corporation's directors, "when becoming informed in connection with their decision-making function or devoting attention to their oversight function, shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances." 13-C M.R.S.A. § 831(2). The MBCA also imposes a fiduciary duty of good faith and loyalty on members of a corporation's board of directors, namely that the directors must act "[i]n good faith," 13-C M.R.S.A. § 831(1)(A), and "[i]n a manner the director reasonably believes to be in the best interests of the corporation." Id. § 831(1)(B).

16

under Maine corporate law, and that they relied almost entirely on the acquirer's due diligence for its side of the November 20, 2007 transaction and very little of their own on the Prime Maine side.

But the trustee's claims against the Prime Maine directors fail for a different reason. At least while a corporation remains solvent, Maine law has not recognized any directors' duty to creditors. Tiernan v. Barresi, 944 F. Supp. 35, 37 (D. Me. 1996) ("It is clear under Maine law that a party who is not a shareholder has no standing to litigate a breach of fiduciary duty claim against corporate directors.").[47] The bankruptcy court found that Prime Maine was solvent on November 20, 2007.[48] That factual finding is not clearly erroneous, and it disposes of the trustee's claims on behalf of creditors. See James B. Zimpritch, Maine Corporation Law and Practice § 8.7(b)(vi) (3d ed. 2015) ("As a general rule, persons who are not shareholders of a *solvent* corporation, including creditors, are owed no fiduciary duty by the corporation's officers and directors. . . . Cases from around the country are in accord that the directors of a solvent corporation generally have no fiduciary duties to the corporation's creditors.").

---

[47] Accord Stephen A. Radin, The Business Judgment Rule: Fiduciary Duties of Corporate Directors 2068–81 (6th ed. 2009). There is also no Maine case holding that the directors of even an insolvent corporation have a duty that creditors can reach, but other courts have so held. E.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101 (Del. 2007) (when corporation is insolvent, creditors can assert derivative claims against directors but not direct claims); Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790–91 (Del. Ch. 2004) ("uncontroversial" that directors of an insolvent corporation owe fiduciary duties to creditors). See generally 1 R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations & Business Organizations § 4.16[E] (3d ed. 1998); Radin, supra note 47, at 2081–91.

[48] "[A]t the time of the closing, Prime Delaware had sufficient assets in relation to the business it was engaged and the Defendants were reasonable in their belief that following the closing Prime Delaware would be able to pay its bills as they came due." Mem. of Dec. 23 n.11 [App. 1348]. See my reasoning above, supra 12–16, as to why the bankruptcy court's finding on this element as to Prime Delaware extends to Prime Maine and Prime Missouri.

17

It is true that directors of even a solvent corporation owe duties of loyalty and care to the corporation itself and its shareholders, Tiernan, 944 F. Supp. at 37, duties that can be enforced through a derivative action[49] and therefore by the trustee for the debtors.[50] But here all the shareholders approved what the directors did (it was to the shareholders' benefit[51]) and authorized the transaction,[52] and there can therefore be no derivative action. "It is settled law that: 'A corporation may ratify the unauthorized acts of its officers and directors, if they are within the powers of the corporation. . . . This may be done by a vote of the stockholders . . . .'" Bates Street Shirt Co. v. Waite, 156 A. 293, 297 (Me. 1931) (quoting Camden Land Co. v. Lewis, 101 Me. 78, 63 A. 523, 532 (1905)).[53]

---

[49] Zimpritch says that the reference to a director's duty to "the corporation" in section 831(1) uses "corporation as 'a surrogate for the business enterprise as well as a frame of reference encompassing the shareholder body,'" and that "[t]he duties may, in an appropriate case, be enforced not only by shareholders directly (if the conduct challenged gives rise to a direct claim), but also in the name of the corporation through a derivative action, or by a bankruptcy trustee in the name of and on behalf of the corporate entity." James B. Zimpritch, Maine Corporation Law and Practice § 8.7(b)(vi) (3d ed. 2015) (quoting 2 Model Bus. Corp. Act Ann. § 8.30, Official Comment, at 8-197).

[50] The trustee here brings claims both as assignee of creditors and on behalf of the debtors and their estates. Am. Joint Stipulation of Undisputed Facts ¶ 15 [App. 1141]; Compl. ¶ 24 [App. 0120–21].

[51] The adversary complaint asserted that the shareholders were "insiders" and "negotiated [the] transaction." Compl. ¶ 2 [App. 0116]. The trustee's post-trial brief asserted that "the Shareholder Defendants went ahead with the deal solely to extract the cash consideration payable to them." Pl.'s Post-Trial Br. 2 [App. 1151].

[52] All of Prime Maine's shareholders approved the August 15, 2007 Contribution Agreement and the November 20, 2007 amendment, which authorized the shareholder defendants to receive, in exchange for the shares of Prime Maine, $10,629,459 in cash proceeds (plus $4 million in non-competition payments to Michael and Stephen Kaplan); the $9 million cash value of life insurance policies; the $3,817,000 promissory note; and 40% of Prime Delaware shares. Mem. of Dec. 8–11 [App. 1333–36]; Pl.'s Trial Ex. 53 [App. 2791–3018]; Pl.'s Trial Ex. 124 [App. 3396–401].

[53] The trustee argues from In re Healthco International, Inc., 208 B.R. 288 (Bankr. D. Mass. 1997), that the directors had a duty to Prime Maine that the trustee inherited notwithstanding the unanimous shareholder approval of the November 20, 2007 transaction. See Appellant's Br. 51 (ECF No. 11). Healthco involved Delaware, not Maine, law. In denying summary judgment to the directors in Healthco, the bankruptcy court said:
> Normally, what is good for a corporation's stockholders is good for the corporation. But that was hardly true here if the Trustee establishes the LBO left Healthco insolvent or with unreasonably small capital. When a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors

18

***Bankruptcy Code Section 546(e)***

Like the bankruptcy court, I find it unnecessary to resolve the 11 U.S.C. § 546(e) safe harbor provisions,[54] given the outcome of no liability.

## CONCLUSION

I therefore **AFFIRM** the judgment of the bankruptcy court.[55]

**SO ORDERED.**

**DATED THIS 26TH DAY OF APRIL, 2017**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

> become paramount. *In those circumstances, notwithstanding shareholder consent, a representative of the corporation may recover damage from the defaulting directors.*

208 B.R. at 300 (emphasis added) (citations omitted). In the case before me, however, the bankruptcy court found that the trustee did not establish that the November 20, 2007 transaction left the debtors insolvent or well on their way to insolvency. Mem. of Dec. 16 [App. 1341]. For an extensive description of Healthco, including the ultimate jury verdict in favor of the directors, see Radin, supra note 47, at 2136–49.

[54] Mem. of Dec. 13 n.4 [App. 1338].

[55] If the First Circuit disagrees, presumably the result will be a remand to the bankruptcy court for additional findings of fact. The existing findings are not clearly erroneous, although they may be insufficient. But given the factfinder's role in determining the credibility and persuasiveness of witnesses (for example, the transcript and the written decision both demonstrate the bankruptcy judge's skepticism of the trustee's primary witness, Grover Elliott), a reviewing court cannot determine that this record *requires* judgment for the trustee. See Morin v. Dubois, 1998 ME 160, ¶ 3, 713 A.2d 956 (Me. 1998) (in a Maine UFTA case, "[w]e will not overturn a finding for the defendant unless the evidence also compels a finding in the plaintiff's favor").

19